We're going to start with Billy Banks v. General Motors. It looks to me like we have two people arguing. Is that right? Three people. Three people. Well, I'm looking for appellant. Okay? So is Ms. Greco starting? Yes. Good morning, Your Honors. Good morning. I would like to stand on my brief but just raise a few points. I think it's important to discuss the hostile work environment claim because the court found that a reasonable person would not find the environment at GM's Lockport plant as hostile or abusive to female or African-American employees. It said that the plaintiff only presented isolated incidences, not extremely serious, either singularly or collectively. And then it went on to find that Banks didn't endure a steady barrage of racial insult or epithet and only four sexually disbearing comments addressed to her. They also said she didn't claim she was threatened, that the incidents were frequently episodic without events being connected by a comment after a repeat incident, and not severe, especially the incidents that occurred to Plankton. It's our contention that the court failed to view the evidence in the light most favorable to Banks and disregarded significant evidence. And an example of that, I'd just like to use one example out of the defendant's brief. When it explains the incident that occurred to Banks in 2002, it says that Banks alleges that she was erroneously found not to be disabled when she took medical leave in 2002, leading to her termination and reinstatement. And in fact, what occurred factually is the head of HR, you can remember that. It's really important in this case. This isn't a case where someone just complains to HR. HR is her supervisor. HR, with all the knowledge and power HR has, could take action from the very beginning all the way through. Fennell was her HR personnel director, the number one person in the plant for HR, all the way through until Sue Guthrow took over in approximately August of 2013. So he was engaging the discrimination the same way we say Guthrow was. You're talking about 2002. So why should that be considered in light of the statute of limitations? Well, Your Honor, I think in twofold. One, it shows him all the way through. So we could look at him during the time the defendant says is relevant. We could also look at his conduct before in general and say, does he have racial animus? Does he have sexual animus? But also we believe that there is a continuing violation, and in our brief we set it up in different areas, like just a continuing violation that deals with threatening behavior, a continuing violation, acts outside and acts inside the period, that deal with degradation, the environment that continues the whole time, you know, that's out for everyone to see. But you're still talking about a period that lasts over 15 years and that without dates, without frequency in that period, you seem to present a narrative as if it all happened within the space of 10 months. But that isn't what the record suggests. Your Honor, even if we look at the period that the defendant contends, it's our position there is sufficient evidence to create a hostile environment. She had the same HR supervisor through that whole time, and he and others engaged in this conduct. These people worked together for a long time. And GM didn't own the plant for a period of, what, 10 years in that time? We would argue substantial continuity because all the players are the same. I mean, when the plant was taken over, there was notice. The HR person knew that banks had complained all along about him and others. She continually complained. You said that she continually complained, but the record also shows that there were numerous incidents in which she did not lodge a complaint. Your Honor, sometimes, like in the Brzezinski case, when you complain and complain and complain and you're complaininging to HR, no one takes action. You complain about every single thing. There are many complaints in this case. She talks about what she said orally, and you can see how she went through the whole chain. Let's look at the period where she goes to the aware line, where she goes here and she goes there, and no action is taken. A great example of that is when Miller does a training class. And in the training class, there are two African-American women, and we have an affidavit from one of those women, Melissa Patterson. And during that training, he makes this comment about Billy Banks, and we can tie it back into Miller. Miller is the man who shows his racial animus when he's doing a training with Billy Banks. And he uses her as a lazy, stay-at-home African-American who's a drug user and can use Narcan on her. And with the Asian employee, he says that the rice is flying out of the wok, and they have to rescue him. His racial animus, there's evidence of it for a jury. But when this man's giving this training, he's talking about Billy Banks and saying she's an idiot, and that's what these people do. When Melissa Patterson, who's a black female employee, who's working there, and she hears this, she tells Billy Banks. So does the other bank woman who tells Billy Banks. Melissa thinks no one contacts her. Eventually, they contact her, and she thinks they're going to ask her about what occurred. Instead, they give her some basic survey. Now, here's the head of HR setting up a survey that's irrelevant to what happened to the complaint. Garbage in, garbage out. So if you ask, oh, was the speaker nice? Did the speaker tell you about safety? Yes. But if you don't ask the question, so Melissa, after David says, she took it on her own. They didn't ask her. She wanted them to know, and she wrote it out. Nothing still happens to Melanie. You can wind up that thought. I'm mindful that you're sharing your time. No worries. But what I'm saying is it is not single people doing it once. A lot of these people are coming from the safety department, the one she went in. I always think of the Howley case when I think of this. Howley was the firewoman who got disparaged, and the whole thing about safety is if you don't follow someone in those circumstances because they're disrespected and disregarded, you're creating a really bad situation. The carcinogen here, the issue where when Duke came and Duke didn't know what to do and didn't go to the plant, it was the other people. It was the manager on the floor, and it was the safety rep who called Billy Banks at home because they knew she could do something and did do something. Okay. I think we have those points, and we'll hear you again in rebuttal. Looks like we have Ms. Yeomans. Good morning, Your Honors. Georgina Yeomans for the EEOC. We agree with Ms. Banks that the district court erred when it held that no reasonable person would find the environment at the Lockport plant to be hostile or abusive. Focusing on the period beginning in 2009, the record shows that Ms. Banks endured regular insult, obstruction, and insubordination from her subordinates and from her coworkers in a manner that those individuals did not treat male and white colleagues in the plant. One of the questions that I'm trying to sort through and I think has to do with this continuing violation doctrine is if it's true that, let's say, let's pick a date, 2010, things before that aren't actionable and they're prior to the statute of limitations, if we conclude that the continuing violation standards aren't met, is there still a basis to allow evidence of some of those prior incidents to inform the understanding of the incidents within the time period? Certainly, Your Honor. To answer that question, yes, there is a basis to take into account incidents that are not timely in order to understand the environment at the Lockport plant and to better understand the motivations or what a jury can infer were motivations by some of the individuals involved. But I would like to emphasize that the Supreme Court was clear in Morgan that specifically in the context of a hostile work environment claim, so long as one of the incidents giving rise to the hostile work environment takes place within the statutory time period, the court can consider and the jury can consider the totality of the circumstances that contributed to that hostile work environment. So it's our position that those events fall within the Morgan standard and should be considered as constituting the case. And when they can consider that as part of the totality of the circumstances, does that mean that when the jury gets to the question of damages, they can reach back prior to the limitations period? You know, let's say they're doing a per diem sort of theory of damages and award damages for that time, or when you say they inform the totality, it's just that that evidence can help tell us whether there was a hostile work environment during the relevant time? Let me just clarify Your Honor's question. So under Morgan, it's one violation that takes into account the totality of the circumstances. So all of those events that are related and contribute to the hostile work environment would be included in the violation. And therefore, I think in damages, we don't separately address that issue in our brief, but it's all part of the same violation. Yes. Thank you. Could you take a minute to address the question of severity and the district court, where the court erred by requiring the banks to show that abuse was both frequent and severe. GM argues that you incorrectly conflated frequent and pervasive. What's the agency's response about what pervasive means and whether it's just frequency or whether it's something else? Right. So the Supreme Court has made clear and this court has acknowledged that when we look at a hostile work environment, we take into account frequency, severity, whether the plaintiff was unreasonably obstructed in performing her job and whether there was humiliation and insult. And so what the district court seems to have done in its reasoning in applying those factors was acknowledge frequency but then seems to discount the frequency because of a lack of severity or acknowledge obstruction to Ms. Banks' ability to do her job but discount that because of a lack of adverse consequences. And in terms of frequency and pervasiveness, whether or not those are interchangeable, I think the way that those have been treated in the judicial opinions are almost as interchangeable and it certainly cannot be the case that pervasiveness means simply widespread mistreatment because it's certainly the case that one coworker repeatedly harassing someone where none of those individual incidents are particularly severe but it's ongoing could constitute a hostile work environment and even though it's coming from one person it couldn't really be said to be widespread necessarily. To be clear, you don't need severity but the court should look to see whether there is severity and if so, to what extent, right? That's correct, Your Honor. I see that I'm out of time. Unless the court has any other questions, we would urge the court to vacate the summary judgment grant. Thank you. Ms. Bennett. Good morning and may it please the court. My name is Rebecca Bennett and I'm counsel for General Motors in this appeal. Appellee respectfully requests that the court affirm the district court's granting of motion for summary judgment. There are three separate claims at issue here. There's a disparate treatment claim, hostile work environment claim, and retaliation and the first two are based on race and sex. I'd like to address the hostile work environment claim first. In the spaces of pages of a brief, these incidents do seem numerous but in the context of an entire... My law clerk prepared an appendix for me and there are three dozen instances of arguably hostile conduct. I have a similar chart, Your Honor. How many are on your chart? And I understand that concern but Ms. Banks worked for GM and its predecessors for 35 years and these 23 or 26, depending on how you count them, incidents are less than one incident in the workplace a year and the most severe ones, the ones that involve a racial epithet occurred in a time-barred period and not just on the cusp of the time-barred period, 10 years before the time-barred period. How do you count? Some of the evidence, as I understand it, was not about one-offs but it was about things that were ongoing. So for instance, the graffiti, right? The graffiti on the walls that's around. Are you counting that as one incident? Or every day that you go to work and you see that graffiti is an incident in which case you've got a pretty high number. Well, Your Honor, in the case of the graffiti what the record evidence shows us is that as soon as Ms. Banks brought it up it was removed. So we don't have a record that shows us a year's worth of looking at graffiti. But it keeps happening. The three noose incidents, some would say that's pretty severe. It's certainly unacceptable if it occurred, no doubt about it, but it's not actionable based on the severe or pervasive totality of the circumstances. Those noose incidents, by the way, did not happen to Ms. Banks nor did they happen in her presence. But they can still be considered in evaluating the totality of the circumstances. Don't you agree with that? And they were. They were considered. The district court did seem to discount the conduct directed at others. Sure. Is that correct or is that a wrongful application of the law? That's an absolutely correct application of this court's rule in RASME v. Marriott. So what this court held is that when you're looking at these secondhand stories you have to look to see if this was purposely taking place in the plaintiff's presence. That's a quote from this court in RASME. That didn't occur here. These incidents did not take place. So if somebody hangs a noose, just puts it there after hours, not knowing who's going to encounter it, and that's happening regularly, and there's clearly a message there that's incredibly threatening, your position is unless an individual African American employee happens to be the one who stumbles on it in the first instance, it doesn't get much weight. Well, there's two things to answer your question, Your Honor. First, the record doesn't show it happened regularly. No, no. This is a hypothetical. But if it did happen regularly, then we have a hearsay problem because we don't know if it happened. We just heard about it. Maybe it didn't happen. We just heard about it. It's hearsay. So it shouldn't come in on summary judgment to support a claim. Otherwise, every single employee in the company would be able to come into this court with a claim if there was rumors about a noose. And we'd be trying several different cases. In Mrs. Banks' case, we'd be trying the truth and veracity of whether the noose incident occurred. So here, the court took those 26 incidents, or 23, and carefully examined each of them. And they can fall into these categories. Five of them are incidents that are time-barred. Five were overheard by Banks but not directed towards her. And they weren't concerted, continuous and concerted. That's the other phrase that this court uses in RASME. Nine of them were facially neutral. So they didn't relate to sex or race. And those nine incidents that were facially neutral were the results of different individual actors. There wasn't a continuous actor in connection with those incidents. Four of them are second-hand stories, events that didn't occur in her presence or hearsay. So that leaves, out of all these incidents in all the paper we all read before this case, three over a 31-year career. And none of them have to do with race. They all have to do with sexual harassment. None of them were reported. Well, now, are you, I mean, the training with the comment about you're at home needing the Narcan, are you counting that as racially neutral? Counting that as facially neutral. We don't have enough information in the record. You have to make too broad of a leap to presume that this gentleman thought that only African-Americans have a heroin issue. Even in the context of the other example being used in the same training, was an Asian person, and the example involved the wok and the rice, it doesn't suggest a reasonable person couldn't draw that inference? It's not acceptable, but it's not actionable, considering the totality of the circumstances. No, no, but I think the question that we're talking about right now is a narrow question, which is you're describing that incident as facially neutral. Sometimes, I mean, it's true that some things are obviously racially charged because words are used. But a lot of times you have to infer from context. And so I'm asking you in that case whether a reasonable person could infer from the context that that incident was very much a racial commentary, even if he didn't use the N-word. But it didn't have to do with Ms. Banks. The part of it, I would disagree that the part about heroin use has any sort of racial connotation. I think that the statistics about heroin use show that it is a devastating problem in both the white and black communities, and perhaps even more so in the white communities in socioeconomic areas. So I don't think that there's any basis. You'd have to go outside the record to make that inference. Isn't that really an argument to the jury? No, it's an argument that should never get to the jury because we're not here on that one incident. If all we were arguing about was that one incident, it would definitely not be enough to create a hostile work environment. But it's in the context of all these other incidents or alleged incidents. And that's the issue with hostile work environment claims. So it's the role of the court to sift through. Because otherwise, if the court wasn't involved in the sifting through and applying the law, then anybody could come forward with a laundry list of allegations. And they'd get to court. And the law of this circuit and of the Supreme Court of the United States says that hostile work environment claims need to be severe. So there's a body of cases. Or pervasive. Or pervasive, as we've been discussing. Right. Or pervasive. So that could mean lower level but consistent and persistent over time. Sure. That would alter the conditions of employment, right? Like in the Razmi case, there were continuous comments about Mr. Razmi's religion and other people's religion over a three-year period every day. We don't have that level of pervasiveness here by any stretch. Could you turn to the retaliation claims, please? I was concerned that you seemed to be taking the position that because the disability payments that were suspended for a period of time were ultimately repaid, that that can't possibly reflect an action that was taken in retaliation. It seems to me that suspending disability payments that are otherwise due, potentially, for retaliatory purpose, potentially, could dissuade someone from taking action and complaining further. Have I misunderstood your position? Is your position that just because repayment was ultimately made, that that can't possibly be actionable? No. I don't think you've misunderstood the position, but there's a little bit more to it. General Motors didn't make that decision. So what happens is Mrs. Banks goes and leaves. The record is that I know there's a third-party administrator, and it's not really clear to me who Dr. Jones works for, but the record doesn't seem very clear about the relationship between the third-party administrator and GM. It doesn't seem to preclude the notion that GM and its staff could have directed the third-party administrator to keep her out as long as possible and then, after the fact, despite Dr. Jones' mentions of the charges and so on in his conversations with Mrs. Banks, then decide to let her back in and repay her. Why isn't that a retaliatory action, potentially? Really big distinction.  GM granted her leave of absence. She requested a leave of absence. They didn't put her out. She requested it. They granted that. The next question is what kind of benefits is she entitled to while on that leave of absence? Benefits are different than wages. They are not guaranteed. They are not vested. You must apply for them, and you must meet eligibility requirements. And you don't get them right away. But if she didn't get them for a retaliatory reason, that would be unlawful, right? I'm sorry? Even if she wasn't entitled to them, if she was denied them for a retaliatory reason, that would still be unlawful. Right. And there's no causal connection here that she was denied them for a retaliatory reason. The doctor refers to the EEOC and says you need counseling on dispute resolution. That's not a reasonable jury. Couldn't infer from that that there was a retaliatory motive? That happened six months later. But it was the same doctor, wasn't it? In 2014, not in 2013, when this decision was made by Sedgwick, the third-party administrator. I'm sorry. I'm sorry, wasn't it? One of the things that struck me, though, is true that this doctor has appeared in two different chapters of this story. Correct. And I'm wondering whether the inferences that you might draw from the later chapter inform our understanding of the earlier chapter. In other words, you're not really arguing that I don't think, I don't really read your argument as saying that being denied pay or benefits for that amount of time is not a materially adverse action. I understand you to be making a nexus argument, oh, it was a third-party administrator, it wasn't us. And if that's true, and I know you're not going to say, yeah, that's really what we're arguing, but that's how I'm reading it, then understanding the role of this doctor, if he was unequivocally a detached third party off with no connection to GM who's making this determination, I think you might have a stronger claim. But we've got what happened the following summer, including him being on the line with the HR people when he's having an interview with her. So actually we have very little record evidence on Dr. Jones. What we have is what Ms. Banks said in her affidavit about him. Ms. Banks did not depose Dr. Jones, and there's very little documentation, and the documentation we have doesn't say anything about the EEOC. It appears that after Dr. Jones initially supplied information that resulted in Sedgwick denying the request, about six months later he learned of the EEOC charge because Mrs. Banks told him about it. So it's not as if he's seeking out information. So the initial denial was definitely – But she testified, though, that he queried her about it, right? I don't know that that's exactly how the testimony goes. I'd have to look back at the deposition transcript, Your Honor. But we do have his report, and it doesn't say anything about the EEOC in his report, and we don't have any other corroborating evidence. You know, be that as it may, with regard to the denial of benefits that Sedgwick made, Dr. Jones had no knowledge of the EEOC complaint at that point in time. In fact, it had just been filed. So there's – at least with that first alleged adverse action, we can't reverse impute the EEOC knowledge because he learned about it later, so it couldn't have influenced the first one. Well, we can't, but we can reverse impute, I think, his relationship to the company. So he is not an employee of the company. No, I understand that. But in understanding how subsequent decision-making involving his opinions happened, taking the inferences in the light most favorable to the plaintiff, that can inform how – what inferences we draw. Well, you're asking us to conclude as a matter of law on this record that plaintiff can't show that his determination to – that she didn't qualify was informed by the company's interest. And I guess that – am I right about that? Is that what you're asking us to – Well, you don't – what I'm saying is that you don't need to, and there's two reasons. First of all, there's no evidence on the record that there's differential treatment. There's no example of white males that had to go out on leave that were treated any differently. There's no example of that. And the other piece of this is – But we're talking about a retaliation claim, right? Right. And so we're sort of conflating the proof here. So on the retaliation claim, we first have – we have two issues. First, they have to establish a materially adverse employment action, okay? And so that doesn't have anything to do with the motive of the actors. It's got to be a materially adverse employment action. Then we still have the causal connection. So perhaps there might be an argument to be made that if this was deemed a materially adverse action, then we would look at what the doctor did or didn't know and determine if that's objectively enough to show this causal connection. Appreciate your argument. Thank you. Thank you. With regard to the disparate treatment claim and also with the retaliation claim – No, I'm sorry. That was sort of my way of saying I think your time is up. Oh, sorry. I thought I had four minutes left. But if you have no – Four minutes over. You're four minutes over. The clock's counting up. It goes down and then back up again. My apologies and thank you very much. Thank you. Appreciate it. Ms. Greco. First, I think when you were talking about the list of incidents, the questions really hit on it. What the judge didn't do below was give any credence to anything that happened repeatedly. So the environment. Billie Banks was a safety supervisor. She had to go out for all the safety issues. She was out in the actual area where these things were all the time. And many of the incidents, a good example is the sexual comments where you make a comment about her backside and watch her or about her breasts and stare at her. She said they happened repeatedly. So all of those words, repeatedly, you know, from 2009, repeatedly. I mean, one time in a brief – Is that enough to get – when we're doing this sort of severe and pervasive sort of assessment, does somebody saying it happened repeatedly, is that enough to get to the jury or do we need more there there? Well, I think that – and I think there's a case on this, but I can't tell you the case now – that talks about that and says that, you know, you're not going to remember every single time, but you know if it happened once or twice or five times or repeatedly. At depositions we would say to someone, more than one, more than five, more than ten. When they say it happened from then continuously, I think a jury can – we can determine. It is more than one, it is more than five, it is more – it's happened many times. And I think the facts, if you look at them as in the light most favorable to Ms. Banks, it's clear about a lot of these incidents happening and that they happen many times. And if you put them together, which is what I did, like the judge, and you make this picture, you have this picture of this environment where comments are being made about her sexually, where there's pictures of women with their breasts, you know, nipples looking. There are sexually offensive pictures to women. There are things that are a degradation for a person who is African American. You know, you don't want to walk and see the N-word on a wall. And the noose, I mean the noose and the Confederate flag, what worse could you have for an African American than the fear that both of those two things, and my client said that in her – I'm sure in her testimony and also in her declaration. Those things alone, it's like a bell that rings. And one thing I wanted to point out that I found was really even worse. When the noose was hung, and this is the one in, I think, 15, the one that was hung on the – and it was right next to the African American level 7, the only one who was a level 7 male. It was right in her office. So not only did Lucci see it when he was going in where they knew he was going to work, but the other African American was coming in at that time, and he saw it too. So he called banks, because she was on disability at that time, and told her about it. And Lucci, the day she – very soon after she came to work, told her about it. What about the argument that people telling her about it is hearsay and we shouldn't consider it? Do we have independent evidence directly from the people who saw it? Oh, yes. Okay. Lucci testified to what he saw. Okay. And not only that, we have so much testimony. We have testimony that it wasn't a true investigation. I mean – Excuse me. Am I right that there were two noose incidents, and they both were – they were in July 2014, one with Mr. Birch and one with Mr. Lucci reported? That was the same one. That's the same. Birch was going into his office and saw it. Lucci saw it. So they were hanging from the crane in the weld shop. Right. That's the same. And I said in the testimony, three-quarter inch rope is not a little scraggly strand. I'm asking, so what was the other noose incident? The incident was when they left it on a tugger. There were two employees – Oh, right, right, right. Okay. And what year was that? That was in – hold on, I have it here. The tugger was December of 2017. And I think the 2014 and 2017 are important because it's not only they appeared, it's what the white employee or manager told them. So with regard to that July 14th one, the co-employee said to Lucci, that noose, it's been around for a long time. And then when the tugger situation happened and there was this reason, they posted it. They actually posted pictures of that noose on the tugger, the two people that it happened to that say how offended they were. But the supervisor, the white supervisor said to one or both of them that the noose, it wasn't anything new, it had been around forever. And to me, when you say that to an African-American, that this is a noose, it's been around forever, it sends you a message. It sends you a message. You better be in line because we have this noose and it comes out. And I can't think of anything. I'm Italian. Somebody said, you know, we're doing this for Italians. I would be frightened just like they were. All right. I think we have your argument. Thank you very much. Appreciate it.